## THE MARTHA DAVIS.

### (District Court, N. D. California. May 15, 1899.)

### No. 1,571.

COLLISION—CONTRIBUTORY NEGLIGENCE—ANCHORED VESSEL.

A vessel cannot be held guilty of negligence contributing to a collision because her machinery was disconnected and her sails taken down while at anchor, for the purpose of making repairs, when she was properly anchored in a safe berth, where she remained; the collision being caused by the drifting against her in the night of another vessel, which was insecurely anchored.

An admiralty suit by the United States against the bark Martha Davis to recover damages for collision.

H. S. Foote, U. S. Atty., and Samuel Knight, Asst. U. S. Atty.
Page, McCutchen & Eells, for claimant.

DE HAVEN, District Judge. This is a libel filed by the United States to recover damages sustained by the United States steamship Patterson in a collision which the libel alleges was caused by the negligence of the master and crew of the bark Martha Davis. It appears from the evidence that on March 9, 1898, the Patterson was lying at a safe anchorage in the bay of San Francisco, undergoing repairs to her engines, which had been taken apart, and were still in that condition, and therefore at the time entirely useless as a means for propelling the steamer, but she was otherwise in seaworthy condition, and was properly manned and equipped. On the evening of the day named, the bark Martha Davis came into the port of San Francisco, and, dropping a single anchor, anchored at a distance of between two and three hundred yards from the Patterson, and further from the wharves than the latter. At that time there was only a light breeze blowing, and the one anchor used by the Martha Davis was sufficient to hold her. The Patterson also, at this time, had but one anchor out. About midnight the wind commenced blowing a strong gale from the north, and the master of the Patterson soon ascertained that the one anchor already out was not holding his vessel, and another was let go, but not until after the Patterson had drifted some distance further away from the Martha Davis, and nearer to the wharves. When the second anchor was dropped, the Patterson was so close to the schooner Ivy, also lying at anchor, that she was soon compelled to take in five fathoms of her anchor chain, in order to avoid a collision with that schooner. Between the hours of 4 and 5 o'clock on the morning of March 10th, the Martha Davis and the Patterson came into collision. There is a direct conflict in the evidence as to whether this collision was caused by the drifting of the Patterson into the berth of the Martha Davis,

or whether the Martha Davis dragged her anchor, and drifted onto the Patterson, in the berth of the latter. It would serve no useful purpose to state at length the testimony of the different witnesses relating to this disputed question of fact. It is sufficient to say that the testimony has all been carefully considered, and my conclusion is that the great preponderance of the evidence is in favor of the contention of the libelant upon this point. The Ivy did not change her position during the night, and the admitted fact that the collision occurred near this vessel tends strongly to show that, after casting her second anchor, the Patterson ceased to drift, and that the Martha Davis must have dragged her anchor in the direction of the Patterson; otherwise, she could not have come into collision with the latter in the vicinity of the Ivy. The conclusion that the collision occurred in the berth of the Patterson, and not in that of the Martha Davis, is further strengthened by a consideration of the direction of the wind and the relative positions of the vessels as they lay at anchor. I think, also, the evidence establishes the fact that the master of the Martha Davis was guilty of negligence in not letting go a second anchor. By so doing, it is reasonably certain the collision would have been avoided, and it is clear, from the evidence, that there was ample time to have done this after the bark began to drift, and before her collision with the Patterson; but, in any event, the strength of the gale, which commenced some three or four hours before the collision, was such as ought to have suggested to the master of the Martha Davis that it was not at all certain that one anchor would be sufficient to hold his vessel, and that, as a matter of ordinary prudence, he should let go a second for the purpose of properly guarding against the danger of drifting into collision with other vessels.

It is contended upon the part of the claimant that the Patterson was guilty of contributory negligence in being at anchor in a helpless condition, with engines disconnected and sails taken down. I do not think this contention can be sustained. The Patterson was properly anchored in a safe berth, and the fact that her engines and sails were not at the time in a condition for immediate use cannot be attributed to her as a fault. Her master was not bound to anticipate that there would be negligence on the part of the Martha Davis or other vessels at anchor in the harbor, and was therefore not required to have the engines and sails of his steamer in condition for immediate use, in order to avoid any collision which might result from such negligence.

It is lastly urged by the claimant that the Patterson was, in view of her own helpless condition, guilty of contributory negligence in not signaling for the assistance of a tugboat. The answer to this is that it was not known on the Patterson that the Martha Davis was not securely anchored, and, although she had been sheering during the night, it was not apparent, until shortly before the collision, that she was drifting onto the Patterson, and it was then too late to have obtained assistance from any of the tugs in the harbor. The libelant is entitled to a decree for the recovery of the damages sustained by the Patterson, and the case will be referred to United States Commissioner Manley, to ascertain and report the amount of such damages.